IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALONZO J. PAYNE, | § | |
| | § | No. 289, 2014 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: |
| | § | |
| v. | § | Superior Court of the |
| | § | State of Delaware, in and for |
| STATE OF DELAWARE, | § | Sussex County |
| | § | |
| Plaintiff Below, | § | Cr. I.D. No. 1308012898A |
| Appellee. | § | |

Submitted: March 4, 2015
Decided: March 30, 2015

Before **STRINE**, Chief Justice, **HOLLAND** and **VALIHURA**, Justices.

## O R D E R

This 30th day of March 2015, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1)     Defendant below, Alonzo Payne ("Payne"), argues on appeal that, because a witness informed the jury of the defendant's previous incarceration, a mistrial should have been granted in his trial for First Degree Robbery, Possession of a Firearm During the Commission of a Felony, and Tampering with Physical Evidence.  We disagree, and for the reasons stated herein, we AFFIRM the judgment below.

(2)     On August 16, 2013, Darryl Hutt ("Hutt") left work and cashed his weekly paycheck of $280 at the Service General.  Hutt then walked to the

apartment of Ashley Drummond ("Ashley") to find his cousin Shawn Smith ("Smith"). When Hutt arrived at the apartment, Smith was not there, but Ashley's brother Yahi Drummond ("Yahi"), her cousin Teuntay Drummond ("Teuntay"), and Payne were there. Shortly after Smith arrived, Hutt and Smith left the apartment.

(3) Smith and Ashley had been arguing throughout the day and continued to argue over the phone after Smith left the apartment. Yahi overheard the argument and called Smith. During that conversation, Smith told Yahi that he and Hutt were going to the Service General to cash Smith's paycheck. Once they arrived, Smith went inside, and Hutt remained in the car to count his money. A black Cadillac pulled into a nearby parking spot. Three males got out and approached Hutt's window. Hutt testified that he was "struck" and then felt a "snatch on [his] leg," after which his money was gone. When Hutt looked up, he noticed that a man wearing a white shirt and red shorts had a gun pointed at him.

(4) Smith exited the Service General while the three men were walking back to the Cadillac. Smith recognized the three men as Payne, Teuntay, and Yahi. Smith testified that Payne was wearing a white shirt and red shorts. Hutt told Smith that the three men had just robbed him. Smith approached Payne and asked for the money back. Payne refused, and the three men drove off in the Cadillac. Later, Smith and Hutt went back to Ashley's apartment to ask for the money back, but Payne refused again.

2

(5)     Smith and Hutt reported the incident to the Georgetown Police Department.  In addition to describing Payne's white shirt and red shorts, Hutt reported that, of the money stolen, one of the twenty-dollar bills and one of the ten-dollar bills were torn.  The police responded immediately.  Upon arriving at Ashley's apartment complex, officers identified Payne by his clothing.  One of the officers drew his weapon and ordered everyone to put their hands up.  Payne ran into Ashley's apartment.  About thirty seconds to a minute later, Payne reappeared at the front door and then exited the apartment.  One of the officers then took Payne into custody.  When the police searched Ashley's apartment, they found a black revolver under a couch.  Tamara Midgette ("Midgette"), who was inside Ashley's apartment during the arrest, testified that Payne ran into the apartment, hid something under the couch, and gave her $179.[1]  The money the officers recovered from Midgette included a twenty-dollar bill and a ten-dollar bill with tears matching those Hutt described.

(6)     Payne argues that the trial court should have declared a mistrial because a witness informed the jury of Payne's previous incarceration during the following exchange between defense counsel and Smith:

---

[1] Detective Bradley Cordrey testified that $129 was removed from Midgette and then an additional $50 was recovered "where she had hidden it in another location."  Midgette testified that, "[Payne] had ran in and hid something under the couch and hid on the floor and threw me $130."

3

Q: But you've known Yahi a lot longer than Alonzo Payne, correct?

A: Yes.

Q: And you're much closer with Yahi than you are with Alonzo Payne, correct?

A: I knew him longer because I go with his sister.

Q: Right. You've had much more contact with him?

A: Yeah, of course. Yeah, because I didn't know [Payne] until later, because *he was locked up when I started going with Ashley Drummond*.

The Superior Court immediately struck the phrase "locked up" and told the jury to disregard it. Payne then moved for a mistrial, and the trial court denied the motion. Payne argues that this denial was an abuse of discretion.

(7) A decision to grant or deny a mistrial is reviewed for an abuse of discretion.[2] "This grant of discretion recognizes the fact that a trial judge is in the best position to assess the risk of any prejudice resulting from trial events."[3] "A trial judge should grant a mistrial only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[4] "The remedy of a mistrial is 'mandated only when there are 'no meaningful and practical alternatives' to that

---

[2] *Smith v. State*, 963 A.2d 719, 722 (Del. 2008); *see also Pena v. State*, 856 A.2d 548, 550 (Del. 2004) (citing *Taylor v. State*, 690 A.2d 933, 935 (Del. 1997)).

[3] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (citing *Brown v. State*, 897 A.2d 748, 752 (Del. 2006); *Flowers v. State*, 858 A.2d 328, 334-35 (Del. 2004); *Pena*, 856 A.2d at 550; *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2002); *Hope v State*, 570 A.2d 1185, 1189 (Del. 1990)).

[4] *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974)); *see also Brown*, 897 A.2d at 752.

remedy.'"[5] A trial judge's prompt curative instructions are presumed to cure error and adequately direct the jury to disregard improper statements.[6] "Juries are presumed to follow these instructions."[7]

(8) In *Pena v. State*, this Court set forth a four-part analysis to determine whether the unsolicited comments of a witness require the trial judge to declare a mistrial. Applying this analysis, we consider: "(1) the nature and frequency of the comments; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the sufficiency of the trial judge's efforts to mitigate any prejudice."[8]

(9) Here, the first factor militates against a mistrial because Smith made a single statement that Payne had been "locked up." Our decision in *Smith v. State* is instructive. There, we considered the nature and frequency of two comments by a witness: one comment suggested that the defendant was a habitual offender,[9] and the other comment referenced a plea offer received by the defendant.[10] In finding

---

[5] *Smith*, 963 A.2d at 722 (quoting *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994); *Bailey v. State*, 521 A.2d 1069, 1077 (Del. 1987)).

[6] *Smith,* 963 A.2d at 722.

[7] *Id.*

[8] *Id.* at 723 (citing *Pena*, 856 A.2d at 550-51).

[9] *Id.* at 720:

Q: After that letter, did you and Corey have more discussions about the case?

A: After that letter, he was, like, "Yo, man, you going to confess? They trying to get me habitual." I'm like, "Hmm?" He said, "They trying to get me habitual." I'm like, "I'm not taking all the charges. I already got enough charges on me."

[10] *Id.* at 721:

5

that the first factor did not favor a mistrial, we noted that "[b]oth comments were fleeting, unsolicited, and reflect [the defendant's] own words."[11] Further, in *Jones v. State*, a witness testified that a detective brought mug shots for the witness to examine.[12] We held that "[t]he witness only used the term 'mug shots' once, so the nature and frequency of the conduct weighs against [defendant's] argument."[13] We reach the same conclusion here as to Smith's sole statement.

(10) Payne urges us to consider our decisions in *Bailey v. State*[14] and *Gomez v. State*.[15] In *Bailey*, the Superior Court declared a mistrial *sua sponte* based on statements made by three State's witnesses.[16] During questioning of one witness by defense counsel about statements she had made at "a prior proceeding,"

---

Q: What was that communication?

A: I said, "What they offer you?" He said, "Ten."

[11] *Id.* at 723.

[12] *Jones v. State*, 2013 WL 596379, at *1 (Del. Feb. 14, 2013):

[Q]: When Detective Tabor came to see you a few days later, did he bring something for you to look at?

[A]: Yes.

[Q]: What was it?

[A]: Mug shots.

[13] *Id.* at *2.

[14] 521 A.2d 1069 (Del. 1987).

[15] 25 A.3d 786 (Del. 2011).

[16] *Bailey*, 521 A.2d at 1073-74. In *Bailey*, the appellant argued that "the prosecution *intentionally* elicited a remark by a state witness which prompted the trial court to declare a mistrial *sua sponte*, during the course of the defendant's second trial in 1983. Bailey contend[ed] that any subsequent trial was barred by his State and Federal Constitutional right to be free from being placed in jeopardy more than once for the same crime." *Id.* at 1073.

she was asked if she had testified under oath.[17]  She responded, "Do you mean the last trial?"[18]  Neither the defense counsel nor the prosecutor asked for any corrective action from the judge.  Another witness, who was a friend of the defendant, testified for the prosecution.  This witness testified that the defendant told him of his desire to have the chief prosecution witness killed.  During cross-examination of this witness by defense counsel, the witness was asked about the timing of his disclosure to the police of these conversations with the defendant.  He responded that, "[i]t was when this first trial, these new proceedings started, two, three months ago maybe."[19]  At this point, the defense argued the need for a mistrial, or at a minimum, a cautionary instruction to the jury.  The trial court did not declare a mistrial.  Nor was a cautionary instruction given after the trial judge advised that doing so would compound the problem.  When a third witness stated, "it was common knowledge to the institution what Mr. Bailey was doing time for: a life sentence for murder," the trial court stopped the proceedings and declared a mistrial.[20]

(11)  This Court held that a mistrial was warranted in *Bailey* because the witnesses' statements indicated that the defendant had been found guilty at a prior

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at 1074.

trial for the same offense for which he was then on trial, namely, murder.[21]  Here, there was no mention of the offense for which Payne had been "locked up" or the amount of time Payne had served.  Further, *Bailey* involved improper statements by three witnesses, while there was only one such remark in Payne's trial.

(12)  We distinguished *Bailey* recently in *Snipes v. State* -- a case in which a testifying police officer informed the jury three times that there had been a prior trial.[22]  In *Snipes*, the trial court denied a motion for a mistrial because "the references in question were made by only one witness, there were no references to prior convictions, and the answers were in response to defense counsel's questions on cross-examination."[23]  Counsel initially requested a curative instruction, but later stated that "a curative instruction did not appear to be proper because it would bring up the issue of a prior trial again."[24]  Thus, the trial court did not give a curative instruction to the jury after the officer's statements.  We held that the trial court did not abuse its discretion, and distinguished that case from *Bailey* on the grounds that "three witnesses testified in *Bailey* as opposed to one witness in [Snipes'] case, and the third witness in *Bailey* explicitly mentioned the defendant's

---

[21] *Id.* at 1076 ("The jury not only learned that the defendant had been previously tried for the same charge, but that the 1980 trial had ended in a conviction.  That information, regardless of how it is received, is inherently prejudicial and even more so when a juror is exposed to those facts during trial." (citing *Hughes v. State*, 490 A.2d 1034, 1044-47 (Del. 1985))).

[22] *Snipes v. State*, 2015 WL 1119505 (Del. Mar. 12, 2015).

[23] *Id.* at *2.

[24] *Id.*

prior murder conviction."[25] Here, Smith did not reveal who was involved in the previous trial or the subject matter of the previous trial. Accordingly, the first *Pena* factor weighs against declaring a mistrial.

(13) The second *Pena* factor requires us to consider the extent of any prejudice caused by the comment. Both *Bailey* -- for the reasons stated above -- and *Gomez* are distinguishable as to the issue of prejudice. In *Gomez*, the appellant argued that the trial judge erred in denying a mistrial after the minor victim's mother referred to Gomez's commission of a similar sexual offense against the minor victim's cousin.[26] This Court noted that the "testimony 'injected into the trial the assertion of a prior bad act that was patently and squarely on point with the very type of crime for which [Gomez] was on trial."[27] We held that the "testimony created an impermissible inference that [Gomez] had committed the offense for which he was being tried."[28] In that circumstance, a mistrial was required because the context of the witness' testimony was so closely related to the evidence that had been excluded from his trial that prejudice from the testimony far exceeded the

---

[25] *Id.* at *3.

[26] *Gomez v. State*, 25 A.3d 786, 793 (Del. 2011). In response to a question about whether the defendant's divorce from the witness's sister was "bitter," the witness stated that "she was leaving him because he had committed a crime, and with not just my daughter, but also my niece." *Id.* at 790.

[27] *Id.* at 794 (quoting *Ashley*, 798 A.2d at 1022).

[28] *Id.*

9

threshold where a curative instruction could have remedied the prejudice.[29]

Smith's statement at Payne's trial is distinguishable from the statement in *Gomez* because Smith's testimony did not refer to the offense for which Payne was incarcerated.

(14) Payne's reliance on *Ashley v. State* and *Hughes v. State* is also unavailing. We found prejudice in *Ashley* because, among other reasons, "[t]he [witness'] outburst went directly to the key issue of whether or not Ashley was guilty, and it patently prejudiced Ashley's claim of self defense because it accused Ashley of previously being the aggressor in an unprovoked stabbing."[30] Similarly, in *Hughes* (as in *Bailey*), the witness' statements referred to a prior trial in which the defendant was previously found guilty of the same offense for which he was then on trial.[31] Given the vagueness of Smith's comment, the second factor of *Pena* weighs against finding that the trial court abused its discretion.

(15) The third *Pena* factor requires this Court to consider the "closeness of the case." This factor also weighs against finding that the trial court abused its discretion. Here, three witnesses identified Payne as the person who committed the offense. In addition, the State put forth substantial circumstantial evidence

---

[29] *See Ashley*, 798 A.2d at 1022.

[30] *Id.* at 1023.

[31] *Hughes*, 490 A.2d at 1044; *Bailey*, 521 A.2d at 1076.

suggesting Payne was guilty.[33] Because the case against Payne was not close, the third *Pena* factor weighs against granting a mistrial.

(16) Finally, the last *Pena* factor is "the sufficiency of the trial judge's efforts to mitigate any prejudice."[34] In *Gomez*, we explained the utility of a curative instruction for this purpose:

> [A] prompt curative instruction that does not overemphasize an improper remark is often an appropriate meaningful and practical alternative to a mistrial. It is well established in Delaware that a trial judge's prompt curative instruction is presumed adequate to direct the jury to disregard improper statements and cure any error. But, in cases where there is no meaningful and practical alternative, a mistrial is required. We have recognized that a trial judge should grant a mistrial only where there is a manifest necessity or the ends of public justice would be otherwise defeated.[35]

A mistrial must be declared when the prejudicial effect of the testimony is so great that a curative instruction is not sufficient to overcome it.[36] Otherwise, a curative instruction is presumptively sufficient to allow the trial to move forward.[37]

---

[33] Hutt told the police that the man who robbed him was wearing a white shirt and red shorts. Smith, who knew Payne, identified the man in the white shirt and red shorts as Payne. In addition, Smith recognized Payne as one of the three men who was walking away from his car when the robbery took place. Smith also testified that he approached Payne as he was walking away from the car and asked for the money back, but Payne refused. Additionally, Midgette testified that Payne ran into the apartment, hid something under the couch, and gave her money matching the description of the stolen money, namely, one of the twenty-dollar bills and one of the ten-dollar bills were torn.

[34] *Smith*, 963 A.2d at 723 (citing *Pena*, 856 A.2d at 550-51).

[35] *Gomez*, 25 A.3d at 793-94 (internal quotations and citations omitted).

[36] *See Ashley*, 798 A.2d at 1022-23.

[37] *See Gomez*, 25 A.3d at 793-94; *Smith*, 963 A.2d at 722-23.

11

(17)   For example, in *Smith*, the trial judge, who was concerned about compounding any impact the unsolicited witness statement might have had, did not give an immediate instruction after a witness suggested that the defendant expected to be sentenced as a habitual offender.[38]  However, at the close of evidence, the trial judge instructed the jury not to consider penalties.[39]  We held that the instruction was sufficient, and therefore, the fourth factor of *Pena* militated against declaring a mistrial.[40]  Conversely, in *Ashley*, where the case was close, we found prejudice so severe that a curative instruction was not sufficient to prevent a mistrial because the "outburst was so closely related to the evidence that had been excluded from [defendant's] trial that the prejudice from the outburst far exceed[ed] the threshold where a curative instruction can remedy the prejudice suffered."[41]

(18)   Here, the trial judge took immediate steps to cure any resulting prejudice by stating, "[s]trike the phrase locked up.  Jury is to disregard that."  Counsel then moved for a mistrial, which the trial court denied, reasoning that "[t]he instruction, in my belief, is sufficient.  Juries are prone to follow a judge's

---

[38] *Smith*, 963 A.2d at 720-21 ("The judge reasoned: first, the jurors in all likelihood did not know what the reference to 'habitual' meant; second, according to [the witness], [the defendant] did not say that he was habitual but that 'they trying to get me habitual;' and third, the jury had already been instructed not to consider the consequences of their verdict.").

[39] *Id.* at 724.

[40] *Id.*

[41] *Ashley*, 798 A.2d at 1022.

instruction.  I also feel it came out in an exchange with counsel, and it was almost spontaneous."  We agree with the trial court that the instruction was sufficient to cure any prejudice that may have resulted from Smith's comment.  Accordingly, the fourth *Pena* factor militates against granting a mistrial.

(19)   After carefully weighing the factors under a *Pena* analysis, we conclude that the trial court was within its discretion in denying Payne's motion for a mistrial.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:


/s/ Karen L. Valihura
Justice